## ST. LOUIS–SAN FRANCISCO RAILWAY COMPANY, a Corporation, Plaintiff,

v.

## WARRIOR AND GULF NAVIGATION COMPANY, a Corporation, Defendant.

### Civ. A. No. 80–C–0725–S.

United States District Court,
N. D. Alabama, S. D.

March 31, 1981.

Michael C. Quillen, Birmingham, Ala., for plaintiff.

T. Thomas Cottingham, Birmingham, Ala., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CLEMON, District Judge.

1. St. Louis-San Francisco Railway Company ("Frisco") which has now been acquired by Burlington-Northern Railway Co., Inc., owns and maintains a vertical lift-span, truss railroad bridge ("Frisco bridge") which spans the Black Warrior River at a location north of Demopolis, Alabama.

2. The Frisco bridge was designed and operated by employees of St. Louis-San Francisco Railway Company.

3. The Frisco bridge is designed to raise and lower the lift-span automatically and to give warning to river traffic of bridge operation by both visual and audible signals. The operation of the bridge is designed so that the lift-span of the bridge is in a raised position and four lights mounted on the bridge (two facing upstream and two facing downstream) show a green signal when there is no train or motorcar traffic in the vicinity of the bridge and no testing of the bridge is being conducted.

4. The signal circuitry of the Frisco bridge is designed so that the presence of a train in the approach circuit from the west will drop a relay which in turn completes an electrical circuit causing a siren on the bridge to commence sounding and the four lights facing upriver and downriver to commence flashing yellow as a warning to river traffic that the lift-span may soon begin to lower.

5. The Frisco bridge is equipped with an "electric eye" boat detector which is designed to detect river traffic under the bridge. If the boat detector is operative, the bridge circuitry is designed to lower the lift-span automatically after the approach circuit has been operative for approximately six minutes. In the event the boat detector is inoperative, alternative protection is provided by circuitry which requires manual operation of the bridge by crew members of any train about to cross the bridge.

6. The electric eye boat detector is designed to prevent the bridge from lowering, whether the bridge is being operated manually or automatically, if river traffic is under the bridge. If river traffic breaks the electric eye beam after the bridge has already started down, the bridge will immediately return to its up position.

7. There is a motor car box in the vicinity of the trainman's box. Frisco keeps both boxes locked. The motor car box contains a button by which a Frisco employee can lower the bridge and a button by which he can raise the bridge. The trainman's box contains a button by which the employee can lower the bridge but does not contain a button by which the employee can raise the bridge. Frisco Railroad provided the brakemen keys to the trainman's box, but Frisco did not provide the brakemen keys to the motor car box.

8. The circuitry of the bridge is designed so that the lights facing upstream and downstream change from a flashing yellow indication to a red indication when the trainman's button is depressed. At the same time, the siren being sounded will shut off.

9. Installed on the Frisco bridge is a pen recorder designed to reflect by markings on a time referenced tape the operation of relays which open and close circuits controlling various functions of the bridge.

10. There is a bend in the Black Warrior River roughly one-half of a mile to the north of the Frisco bridge. Only after river traffic has emerged from the bend may it be seen from the bridge; and, conversely, only after such traffic has cleared the bend that a view of the bridge from the vessel is possible.

11. The electric eye boat detector was in a state of disrepair on June 4, 1979; apparently it had not consistently worked since sometime prior to May 5, 1979. Frisco employees were aware that the detector was inoperative on the former date.

12. On the morning of June 4, 1979, Frisco's Train No. 221 was running south by railroad timetable from Amory, Mississippi to Magnolia, Alabama. Shortly after 8:10 A.M. the leading end of that train entered

the approach circuit which begins approximately one and one-half mile west of the Frisco bridge.

13. A train signal is located on the bridge. The train signal shone red as the train approached the bridge.

14. The train came to a stop, just before reaching the movable span of the Frisco bridge, at 8:14 A.M. When the train came to a stop, the siren mounted on the piers of the bridge was activated. This siren could be heard for one quarter of a mile up the Black Warrior River.

15. Prior to the time that the train came to a stop, the bridge's Navigation signal for the river traffic emitted a green light; at the time that the train came to a stop, the river traffic signal emitted a flashing yellow light.

16. The MV Mauvilla, a tugboat with four coal barges in tow, was being operated by employees and agents of the Warrior and Gulf Navigation Company on June 4, 1979 as the vessel was southbound on the Black Warrior River.

17. The Mauvilla was traveling at a speed of five miles per hour as it cleared the bend near the Frisco bridge; and its speed was increasing as it approached the bridge some 2,640 feet away.

18. The captain of the tugboat, Carl T. Ellingburg, was colorblind; and because of this impairment, he could not distinguish between the alternate red and green navigation signals which are suspended from the underframe of the bridge.

19. Ellingburg had been on the river for the five days next preceding June 4, 1979; and as of that date, he was working his thirty-fifth consecutive day without respite.

20. When the train came to a stop, a male brakeman, Joe Benedict and a female brakeman trainee, Joyce Gillespie, dismounted from the locomotive. Their duties as brakemen included that of walking ahead of the train and looking up and down the river to determine whether any vessels were approaching the bridge. If such traffic were approaching, then they were not to depress the button which would lower the bridge.

21. Joe Benedict was in the process of training Joyce Gillespie on the operation of the manual controls in the trainman's box. Although Ms. Gillespie had traveled over the bridge two or three times within the past ten days of her service as a brakeman, on each such occasion the boat detector was operating and there was no occasion to use the manual controls.

22. Neither Joe Benedict nor Joyce Gillespie walked to the end of the fixed span of tracks prior to the allision of June 4, 1979; had either of them done so, he or she easily could have seen the approach of the Mauvilla.

23. Joe Benedict and Joyce Gillespie walked to that point on the fixed span where the trainman's box is located. At that time, they did not carefully look up the river for oncoming traffic.

24. Seeing no river traffic, Joyce Gillespie unlocked the trainman's box and then depressed the release button at 8:24 A.M. This caused the descent of the then-elevated lift-span of the bridge.

25. The lift-span of the Frisco bridge began to lower within seconds after the trainman's button was depressed.

26. By 8:26 A.M., two minutes later, the lift-span of the bridge had fully lowered and was properly seated in its lowered position.

27. One occupying the wheelhouse of the MV Mauvilla and keeping a proper lookout can see the Frisco bridge when the vessel is approximately one-half mile north of the bridge.

28. Looking upriver, in the direction from which the MV Mauvilla approached, a view approximately one-half mile upstream is afforded from the Frisco bridge.

29. All of the circuitry on the bridge (other than the boat detector) was properly operating between 8:00–9:00 A.M. on June 4, 1979.

30. Not having seen the flashing yellow lights from the Frisco bridge because of his failure to keep a proper lookout, Captain

Ellingburg did not realize that the bridge was about to be lowered until it had actually started its descent.

31. When Captain Ellingburg saw that the Frisco bridge was being lowered, he immediately tried to reverse the direction of the Mauvilla. He caused two of the barges to be disengaged before the tugboat struck the bridge.

32. Because of the efforts of Captain Ellingburg, the Mauvilla had almost come to a stop—traveling at the rate of one mile per hour or less—at the time it struck the Frisco bridge.

33. Brakemen Benedict and Gillespie saw and heard the Mauvilla and its horn immediately after the lift-span commenced its descent. Because they did not have keys to the motor car box, they could not activate the controls which would have raised the lift-span and averted the allision.

34. The allision between the Mauvilla and the Frisco bridge occurred at approximately 8:28 A.M., June 4, 1979.

35. Gulf and Warrior Navigation Company suffered damage to the Mauvilla as a result of the allision in the amount of $349.01.

36. The impact of the allision bent the bottom chord of the second panel on the left side of the Frisco bridge.

37. St. Louis-San Francisco Railway Company suffered damages to the Frisco bridge as a result of the allision in the amount of $16,537.60.

## CONCLUSIONS OF LAW

1. Plaintiff St. Louis-San Francisco Railway Company was negligent in the following respects: (a) the failure of its brakemen to walk out to the end of the fixed span so as to obtain a total view of the river; (b) the failure of its brakemen to carefully look up the river from their positions at the trainman's box prior to activating the control which lowered the fixed span of the bridge; and (c) the failure to provide brakemen with keys to the motor car box, which would enable them to interrupt the sequence and raise the fixed span of the bridge in the event of an emergency.

2. The negligence of St. Louis-San Francisco Railway Company is responsible for sixty percent (60%) of the damages sustained by the Mauvilla and the Frisco bridge.

3. Defendant Warrior and Gulf Navigation Company was negligent in the following respects: (a) the failure to maintain a proper look-out as the Mauvilla emerged from the bend and approached the Frisco bridge; and (b) the assignment of responsibility for safe travel under lift-span bridges to an individual who is color-blind and apparently overworked.

4. The negligence of Warrior and Gulf Navigation Company is responsible for forty percent (40%) of the damages sustained by the Mauvilla and the Frisco bridge.

A judgment consistent with these findings shall be entered by the Court.